**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LUCIEN MCARTHUR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:23-CV-01790-MAB** |
| | ) | |
| **ROB JEFFREYS,** | ) | |
| **WEXFORD HEALTH SOURCES INC.,** | ) | |
| **PERCY MYERS, AND** | ) | |
| **J. SMITH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on two motions for summary judgment filed by (1) Percy Myers and Wexford Health Sources, Inc. (Docs. 72, 73) and (2) Rob Jeffreys (Docs. 69, 70). For the reasons set forth below, both motions for summary judgment are GRANTED.

## BACKGROUND

Plaintiff Lucien McArthur ("Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while incarcerated at Centralia Correctional Center ("Centralia") (Doc. 1, 10). Specifically, following a threshold review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff to proceed on the following claims:

> **Count 3:** Eighth Amendment deliberate indifference claim against Jeffreys and Wexford for allowing shortages in medical staffing.

> **Count 4:** Eighth Amendment deliberate indifference claim against Myers for failing to adequately treat Plaintiff's chronic conditions, including his pain.

(Doc. 10). All other claims and defendants were dismissed without prejudice (*Id.*).

## Facts

Plaintiff's claims are based on the medical treatment he received while incarcerated at Centralia (*See* Doc. 10). Plaintiff arrived at Centralia on February 10, 2022, during an emergency transfer of inmates from Pontiac Correctional Center ("Pontiac") to Centralia (*Id.* at 1; Doc. 73-1, p. 44).

Plaintiff suffers from several medical conditions: shoulder pain, a cyst on his right testicle, 13 screws and plates in his left heel from a previous surgery, arthritis in his left ankle and right hip, and chronic pain from these conditions (Doc. 10, pp. 1-2; Doc. 73-3, p. 26). While Plaintiff was incarcerated at Pontiac, he received prescriptions for tramadol and ultram to manage his pain (Doc. 73-1, p. 2). Tramadol and ultram are narcotic pain medications (*Id.*). Plaintiff's narcotic pain prescriptions were renewed on four occasions: March 1, 2021 (*Id.* at 15), May 25, 2021 (*Id.* at 23), August 23, 2021 (*Id*. at 2), and November 17, 2021 (*Id.* at 39). Plaintiff's last prescription, which was for ultram, expired on February 17, 2022—about a week after Plaintiff's arrival at Centralia (Doc. 73-2, p. 337). Prior to his arrival at Centralia, Plaintiff saw Dr. Farah at the University of Illinois Chicago ("UIC") (*Id.* at 461). Dr. Farah assessed Plaintiff's left shoulder and thought Plaintiff had a subacromial impingement/bursitis. (*Id.*). Dr. Farah recommended targeted physical therapy (*Id.*). A physical therapist evaluated Plaintiff for a home exercise program for his left shoulder for two months (*Id.* at 463, 467-470). Finally, one month prior to Plaintiff's

arrival at Centralia, Dr. Andrew Tilden, a physician at Pontiac, completed a referral for Plaintiff to be seen by an orthopedist at UIC for his left shoulder (Doc. 73-1, p. 41). According to the medical records, this referral did not specify surgery, as Plaintiff contends, but was a referral for a follow up with an orthopedic doctor (*Id.*; Doc. 73-3, p. 18; Doc. 73-2, p. 474).

Plaintiff was transferred to Centralia on February 10, 2022 (Doc. 73-1, p. 44). Plaintiff saw Dr. Myers at Centralia a total of three times. The first visit was on March 23, 2022, when Plaintiff saw Dr. Myers for complaints of left shoulder pain and a testicular cyst (*Id.* at 3, 47). Plaintiff requested an orthopedic consult and narcotic pain medication (*Id.* at 3). Dr. Myers explained to Plaintiff that narcotic pain medication "are associated with dependency, increased fracture risk, decreased absorption, increased risk of myocardial infarction, etc. and they are not the standard of care for chronic injuries." (*Id. citing* p. 47). Plaintiff was already taking Mobic, a nonsteroidal anti-inflammatory drug ("NSAID"), and Dr. Myers prescribed Tylenol (*Id.*). Dr. Myers attests that he informed Plaintiff that the Mobic/Tylenol combination is as effective as narcotics (*Id.* at 47). While Dr. Myers charted the above reasoning in Plaintiff's medical records, Plaintiff testifies in his deposition that Dr. Myers never explained any of that reasoning to Plaintiff when they met (Doc. 73-3, p. 17). Instead, Plaintiff contends that when he saw Dr. Myers on March 23, 2023, Dr. Myers "didn't want to hear it" (*Id.* at 15; Doc. 10, p. 2).

Also during Plaintiff's visit with Dr. Myers on March 23, 2022, Dr. Myers made a note in Plaintiff's medical record to locate a CT scan of Plaintiff's shoulder (Doc. 73-1, p. 47). Plaintiff testified that he never received a CT scan of his shoulder (Doc. 73-3, p. 17).

Additionally, Dr. Myers ordered an ultrasound of Plaintiff's testicle, an x-ray of his shoulder, and prescribed 500 mg of Tylenol (Doc. 73-1, p. 47). Plaintiff's shoulder x-ray showed no abnormalities (Doc. 73-2, p. 30).

The second time Dr. Myers saw Plaintiff was on June 1, 2022 (Doc. 73-1, p. 51). This visit was for Plaintiff's complaint of ineffective pain medication (*Id.*). Dr. Myers prescribed Plaintiff an antibiotic for the cyst on his testicle, which in Dr. Myers' medical judgment was caused by a bacterial infection (*Id.* at 10, 51). During the same visit, Dr. Myers increased Plaintiff's dose of Pamelor, which was prescribed to Plaintiff during a preceding appointment with physician assistant ("PA") Smith (*Id.* at 4). However, Plaintiff reports that Pamelor makes him dizzy and sluggish (Doc. 73-3, p. 19). As a result, Plaintiff did not take the Pamelor when Dr. Myers increased his dose (*Id.*).

Plaintiff's final visit with Dr. Myers was on May 15, 2023 (Doc. 73-2, pp. 266-67). Plaintiff complained of continued shoulder pain and needing a second urology surgery (*Id.*). Dr. Myers planned to order waist chains for Plaintiff, as opposed to handcuffing, and a referral for follow-ups with orthopedics and urology (*Id.*). Dr. Myers did not adjust Plaintiff's pain medication at this visit (*Id.*). Dr. Myers also approved several referrals for Plaintiff to see specialists and for outside procedures (*see e.g.*, Doc. 73-1, pp. 449, 551; Doc. 73-2, pp. 324, 330, 474).

In between his visits with Dr. Myers, which spanned from March 2022 to March 2023, Plaintiff saw several other medical providers and nurses. On April 12, 2022, Plaintiff saw PA Smith for foot pain (Doc. 73-1, p. 48). PA Smith prescribed Pamelor for Plaintiff's pain, a low bunk permit, an evaluation for a medical transfer to UIC, and gel inserts for

shoes (*Id.*). On May 2, 2022, Plaintiff saw PA Smith again for Plaintiff's complaints of ineffective pain management (*Id.* at 49). At this visit, PA Smith increased Plaintiff's prescription of Pamelor and renewed Plaintiff's medications (*Id.*). On May 22, 2022, Plaintiff again reported his pain management as ineffective, and the nurse referred Plaintiff to a provider (*Id.* at 50). The provider who Plaintiff saw, on June 1, 2022, was Dr. Myers, who increased Plaintiff's Pamelor prescription and antibiotic for his cyst (*Id.* at 51). Then, on June 6, 2022, Plaintiff saw Dr. Peter Mulhern ("Dr. Mulhern"), an orthopedic surgeon, for his left shoulder (Doc. 73-2, pp. 474, 478, 482). Dr. Mulhern recommended an MRI of Plaintiff's left shoulder, then a follow up (*Id.* at 474). Plaintiff's MRI results were negative (*Id*. at 500-502). On July 5, 2022, Plaintiff saw Dr. Reynal Caldwell ("Dr. Caldwell") for medication renewal, foot pain, and his requested shingles vaccine (*Id.* at 227). Dr. Caldwell planned to give Plaintiff the shingles vaccine, a referral to urology, and 500 mg Tylenol for 90 days (*Id.*).

On October 23, 2022, Plaintiff saw Dr. Alberto Butalid ("Dr. Butalid") for another report of his medications not working, among other complaints (*Id.* at 229). Dr. Butalid stopped Plaintiff's Motrin, prescribed 50 mg Voltaren (an NSAID) for three months, 300 mg Tylenol for three months, and a follow up in two months (*Id.*). On November 18, 2022, Plaintiff saw Dr. Mulhern about his left shoulder (*Id.* at 496-499). Dr. Mulhern found Plaintiff's symptoms to be consistent with chronic bursitis/rotator cuff tendinitis, which would not be responsive to an NSAID medication (*Id.*). Dr. Mulhern recommended arthroscopic surgery of Plaintiff's left shoulder to better evaluate the shoulder (*Id*). On November 22, 2022, Plaintiff saw urologist Dr. Gary Reagan ("Dr. Reagan"), who planned

to refer Plaintiff for a cystoscopy with right epididymectomy (*Id.* at 505-508). Dr. Myers completed the referrals for both the shoulder arthroscopy and the cystoscopy with epididymectomy (*Id.* at 495, 511).

On March 6, 2023, Plaintiff had a cystoscopy and right epididymectomy (*Id.* at 417-18). On April 4, 2023, Plaintiff had a left shoulder arthroscopy (*Id*. at 82-83). After Plaintiff received both surgeries, he said he had no further pain (Doc. 73-3, p. 26). Plaintiff experienced some shoulder pain after the surgeries, but that pain was related to handcuffing rather than his shoulder condition (*Id.* at 23-24).

Plaintiff says he believes there were vacancies in provider positions at Centralia between 2022 and 2025 (*Id.* at 10), but does not know the hours providers were supposed to work (*Id.* at 9); does not know how many hours providers work in a given year and doesn't know whether Dr. Myers or other providers were meeting those hours (*Id.* at 10); and does not know why there were alleged vacancies at Centralia (*Id.*).

## PROCEDURAL HISTORY

On February 27, 2026, Defendants filed the instant motions for summary judgment and supporting memoranda (Docs. 69, 70, 72, 73). On June 2, 2026, Plaintiff filed a response in opposition to Percy Myers and Wexford's motion for summary judgment (Doc. 85), and on July 23, 2026, Plaintiff filed a response in opposition to Rob Jeffrey's motion for summary judgment (Doc. 89). Dr. Myers and Wexford filed a reply (Doc. 87), as did Jeffreys (Doc. 95).

## Legal Standard for Summary Judgment

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

## Discussion

A prison official engages in cruel and unusual punishment under the Eighth Amendment when they are deliberately indifferent towards a prisoner's safety. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Proving a deliberate indifference claim requires evidence of the following: (1) that Plaintiff suffered an objectively serious medical condition, and (2) that Defendant knew about and was deliberately indifferent to Plaintiff's serious medical condition. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). "The first element, an objectively serious medical condition, is satisfied if

'a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson.'" *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (citing *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). The second part of the test shows that a prison official "was subjectively aware of the risk," yet disregarded that risk. *See Farmer*, 511 U.S., at 828. Accordingly, the standard for deliberate indifference is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (quoting *Johnson v. Snyder*, 444 F. 3d 579, 585 (7th Cir. 2006) (internal quotations omitted)).

A delay in medical treatment can also constitute deliberate indifference "if [the delay] exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). "Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment." *Id.* at 778.

Because there is no dispute that Plaintiff suffered from a serious medical condition, the Court's analysis will focus on whether Defendants were deliberately indifferent towards Plaintiff's medical treatment and the medical staffing at Centralia. The Court will first address Plaintiff's claim as it relates to Dr. Myers.

*a. Plaintiff's Deliberate Indifference Claim Against Dr. Myers*

"A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim." *Ebrahime v. Dart*, No. 09-C-1534, 2012 WL 33053 (N.D. Ill. Jan. 6, 2012) (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997)). This is the case "so long as the medical condition is

'sufficiently serious or painful.'" *Id.* (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)). Plaintiff claims that Dr. Myers was deliberately indifferent to his complaints of chronic pain by refusing to prescribe Plaintiff effective pain medication. Plaintiff also contends that he did not see Dr. Myers between March 2022 and May 16, 2023. Plaintiff did not receive surgery for his testicle or shoulder until March 6, 2023 and April 4, 2023 respectively, despite arriving at Centralia with an orthopedic surgery referral for his shoulder.

i. Ineffective pain medication

Plaintiff submitted sick call requests regarding ineffective pain management several times (*see e.g.* Doc. 73-1, p. 48, 49, 50, 51, 227). "The constitutional prohibition on inflicting unnecessary and wanton pain requires medical officials who know that an incarcerated patient is suffering to take 'reasonable measures' to alleviate that pain." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citing *Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011)).

The issues raised by Plaintiff in this case are similar those raised in a recent decision by the Seventh Circuit Court of Appeals affirming the district court's decision to grant summary judgment. *See Arce v. Wexford Health Sources, Inc.,* 75 F. 4th 673 (7th Cir. 2023). In *Arce*, the plaintiff experienced severe leg pain and swelling from a blood clot. *Id.* at 676. While Plaintiff's blood clot was eventually treated, his pain persisted. *Id.* Plaintiff claimed, in part, that certain Wexford medical professionals were deliberately indifferent to his persistent pain by refusing to prescribe him stronger pain medication. *Id.* at 678.

Plaintiff received several different prescriptions throughout the year. *Id.* at 677. At one point, he was prescribed ultram, a narcotic pain medication, but the prescribing doctor later decided not to renew plaintiff's ultram prescription. *Id.* Over the following months, Plaintiff was prescribed over-the-counter drugs such as Motrin and Tylenol. *Id*. Plaintiff continued to complain of pain, and both a nurse practitioner and doctor changed his non-narcotic pain medication prescriptions in response to those complaints. *Id.* at 677-78. Plaintiff's blood clot was eventually resolved, but Plaintiff asserted that he never regained range of motion in his right leg and that his pain continued. *Id.* at 678.

The Seventh Circuit concluded that summary judgment was proper as Defendants were not in violation of the Eighth Amendment for their prescription of non-narcotic pain medication despite the plaintiff's ongoing complaints of pain. *Id*. at 681. The Court reasoned that "[t]here are many reasons for doctors to tread carefully when prescribing strong pain medications." *Id*. *citing Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Indeed, the Court noted that it was not a situation in which the defendants had failed provide any pain relief whatsoever or completely refused to respond to the plaintiff's complaints. *Id.* The Court pointed to the several instances in which the defendants *did* prescribe several pain medications, including Motrin and Tylenol, and that this constituted a repeated effort from defendants to respond to plaintiff's complaints of pain. *Id.* (emphasis added). Moreover, Plaintiff did not offer expert testimony to show that these prescriptions suggest "no minimally competent professional would have acted as defendants did." *Id.* (citations omitted).

Similarly here, the Eighth Amendment does not bar Dr. Myers from not renewing Plaintiff's narcotic pain medication and switching to a non-narcotic pain medication regimen that he believed would be equally as effective as narcotics for Plaintiff. *Arce*, 75 F.4th at 681 (finding a lack of evidence "that defendants' recommended course of treatment was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."). However, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medications." *Id.* at 681 (citations omitted); *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment."). Dr. Myers took "reasonable measures" to alleviate Plaintiff's pain. *Arce*, 75 F.4th at 681. Dr. Myers first prescribed Plaintiff Tylenol because he believed the Mobic/Tylenol combination would be as effective as narcotic pain medication. Additionally, Dr. Myers increased Plaintiff's dose of Pamelor when Plaintiff reported that his previous dose had not been effective and prescribed antibiotics for Plaintiff's testicular cyst.[1] *Id.* at 681 (finding that the record showed evidence of Defendants repeatedly altering Plaintiff's pain medication in response to his complaints,

[1] Plaintiff indicated that Pamelor makes him dizzy or sluggish and thus he declined to take it once Dr. Myer's increased his dose. However, Plaintiff had also been prescribed the Tylenol/Mobic combination to treat his pain. Plaintiff's preference for one medication over another is simply not evidence of deliberate indifference. *Lockett*, 937 F.3d at 1024 ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment.").

which contributed to the granting of summary judgment for Defendants).[2] In short, Dr. Myers has articulated a sufficient reason, based on his medical judgment, why he chose to prescribe non-narcotic medication that he believed would have the effect of narcotics. In so doing, he considered the risks of prescribing narcotic pain medication, which include dependency, increased fracture risk, decreased absorption, increased risk of myocardial infarction (Doc. 73-1). Moreover, he noted that narcotic pain medication is not within the standard of care for treatment of chronic pain/injuries. *Snipes*, 95 F.3d at 592 ("The administration of pain killers requires medical expertise and judgment. Using them entails risks that doctors must consider in light of the benefits.").[3]

In his response brief, Plaintiff relies on Seventh Circuit case law to argue that providers *not* prescribing narcotic pain medication can result in a finding of deliberate indifference (Doc. 85, pp. 9-11). One case Plaintiff relies on is *Walker v. Benjamin*, where a doctor had prescribed narcotic pain medication, but a nurse refused to give it to Plaintiff.

---

[2] Dr. Myers saw Plaintiff on May 15, 2023 (Doc. 73-2, pp. 266-67). At this visit, Plaintiff also complained of continued shoulder pain, but Dr. Myers did not change Plaintiff's prescription (*Id.*). However, Plaintiff testified that the pain he experienced at this visit was a different pain associated with the manner of handcuffing, rather than the pre-existing pain he needed prescription medication for (Doc. 73-3, pp. 23-24). Plaintiff requested waist chains instead of handcuffing (*Id.*). Dr. Myers put in a medical order for Plaintiff to be waist chained as Plaintiff requested (*Id.*).

[3] Plaintiff argues in his response brief that Dr. Myers has a "no narcotics policy" (Doc. 85, p. 7). Plaintiff included in his response brief several affidavits from other inmates attesting to Dr. Myers discontinuing their narcotic medication (*Id.* at 21-24). As a general matter, Plaintiff's claim against Dr. Myers is an individual action for Dr. Myers' treatment of his complaints of pain and whether his treatment was effective. Dr. Myers' treatment of other individuals, whose medical conditions, symptoms, and subjective complaints are completely unknown to the Court, have no bearing on whether Dr. Myers was deliberately indifferent in this case. To the extent the Plaintiff is attempting to use these affidavits to contend that Dr. Myers did not use his medical judgment in prescribing his medication, Dr. Myers explained his reasoning for opting for a non-narcotic pain medication and adjusted Plaintiff's medications in response to his complaints. There is no evidence to suggest that Dr. Myers' treatment of Plaintiff was so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) *quoting Snipes*, 95 F.3d at 592 (internal quotations omitted).

293 F.3d 1030, 1040 (7th Cir. 2002). Here, Dr. Myers used his medical judgment to prescribe non-narcotic medication after Plaintiff's narcotic medication expired, which categorically differs from a nurse not carrying out a doctor's prescription orders. Moreover, whether a delay in care, including delay in administering pain medication, constitutes deliberate indifference turns on "the seriousness of the condition and the ease of providing treatment." *Boykin v. Smith*, No. 22-cv-3057-JBM, 2023 WL 110287, at *4 (C.D. Ill. Jan. 30, 2023). In *Walker*, the plaintiff did not have a minor injury, but "an infection…so severe as to displace a bone and require emergency surgery." 293 F.3d at 1040. But here, Plaintiff suffered from chronic pain, rather than an urgent, time sensitive injury. [4] Moreover, Plaintiff *was* prescribed pain medication that, in Dr. Myers' medical judgment, he believed would alleviate Plaintiff's pain and there is no evidence to the contrary.

ii. <u>Ineffective medical treatment</u>

The Court now turns to the medical treatment Plaintiff received from Dr. Myers. Plaintiff claims that, despite his nurse sick calls beginning in October 2022, he did not see Dr. Myers until May 16, 2023 (Doc. 10, p. 2). Plaintiff also contends that he did not receive surgery on his testicle until March 6, 2023 or his shoulder until April 4, 2023 (*Id.*). Plaintiff

---

[4] The Seventh Circuit has found that "prolonged, unnecessary pain" from lack of pain medication can be indicative of deliberate indifference. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (holding that a gaping wound and open dislocation that went untreated for four days was enough to state a claim for deliberate indifference). *See also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (finding the refusal to treat pain associated with cancer treatment, including painful throat blistering and mouth pain, supports an issue of fact of deliberate indifference at summary judgment); *Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995) (finding an issue of fact at summary judgment for deliberate indifference towards Plaintiff's pain when Plaintiff's cast was casually removed from Plaintiff's arm and pain medication intentionally withheld).

argues that he had a shoulder surgery referral when he arrived at Centralia, but it still took over a year to have his shoulder surgery (Doc. 73-3, p. 14).

However, the record reveals that Plaintiff first saw Dr. Myers on March 23, 2022, then June 1, 2022, and again on May 16, 2023. The totality of Plaintiff's medical record shows that Plaintiff saw several medical doctors in between these visits to Dr. Myers. As a result, the time in between Plaintiff's visits to Dr. Myers does not constitute a delay in care, and particularly there is no evidence to suggest the delay is attributable to Dr. Myers. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (explaining that the Court must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs."). In other words, Dr. Myers was not the only provider treating Plaintiff. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment."); *Boykin*, WL 1110287, at *4 ("Even if they were responsible for referring inmates to doctors or specialists, there is no indication that they were deliberately indifferent by delaying Plaintiff's medical treatment.").

According to Plaintiff's medical records, Plaintiff arrived at Centralia with a referral to an orthopedic doctor at UIC, *not* a referral for shoulder surgery (Doc. 73-1, p. 41; Doc. 73-2, p. 474). However, Plaintiff did arrive at Centralia with a pre-existing shoulder diagnosis of subacromial impingement/bursitis (Doc. 73-2, p. 461). This is the diagnosis that Dr. Mulhern eventually found to be consistent with Plaintiff's symptoms in October 2022 (*Id.* at 496-499). While it took several months for Plaintiff to receive the same shoulder diagnosis that he already received at Pontiac, the evidence does not

suggest that Dr. Myers was reckless in working towards discovering this diagnosis. *McGee*, 721 F.3d at 481. There is no evidence that indicates Dr. Myers knew of Plaintiff's referral to UIC to see an orthopedist, or that Dr. Myers knew of Plaintiff's previous diagnosis of subacromial impingement/bursitis. At Dr. Myers' first visit with Plaintiff on March 23, 2022, Dr. Myers charted a note to locate Plaintiff's previous shoulder imaging (Doc. 73-1, p. 47). This indicates Dr. Myers' attempt to locate information about Plaintiff's medical history. There is a dearth of evidence showing Dr. Myers' subjective knowledge of Plaintiff's pre-existing UIC orthopedics referral, and thus Dr. Myers' treatment of Plaintiff's conditions cannot be said to be unreasonable, given his knowledge. *Stockton*, 44 F.4th at 615 ("To establish a given defendant's knowledge, [Plaintiff] must demonstrate each defendant subjectively knew of [the] risk…and nonetheless disregarded that risk.").

Moreover, Plaintiff does not offer any qualifying medical evidence that any delay in treatment caused him harm. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 834 (7th Cir. 2026) (finding defendant was not deliberately different because plaintiff relied "on nothing more than his diagnosis and ultimate treatment to support his argument the delay caused him harm, but that alone cannot evidence harm stemming from the delay itself."); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (finding that "expert testimony that the [prisoner] suffered because of a delay in treatment" could serve as verifying medical evidence); *Boykin*, 2023 WL 1110287, at *4 ("[T]here is no indication that a one-month delay between his initial encounter with Defendants Smith and Emerson and his

evaluation with the orthopedic surgeon exacerbated his injury or constituted an unreasonable delay.”).

b. *Plaintiff's Deliberate Indifference Claim Against Defendant Jeffreys*

Plaintiff contends that Defendant Jeffreys, as the Director of the Illinois Department of Corrections, allowed for medical staffing shortages at Centralia (Doc. 10, p. 3). Jeffreys argues in his motion for summary judgment that he is entitled to summary judgment because Plaintiff cannot show there was a systemic deficiency in medical staffing at Centralia or that Jeffreys had personal knowledge of such a deficiency (Doc. 70, p. 2).

“[A] prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs.” *Cleveland-Perdue*, 881 F.2d at 431. *See also Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996) (“Senior prison officials may be liable for systemic constitutional violations.”)). However, speculative claims cannot survive summary judgment. *See Barnes*, 177 F.4th at 831.

Here, Plaintiff has failed to adduce any evidence that Centralia's medical staff was understaffed. Plaintiff saw five medical doctors and one physician's assistant while at Centralia: Dr. Myers (Doc. 73-1, pp. 47, 51; Doc. 73-2, pp. 266-67); PA Smith (*see e.g.* Doc. 73-1, pp. 48, 49); Dr. Mulhern (*see e.g.* Doc. 73-2, pp. 474, 478, 482, 496-499); Dr. Caldwell (*see e.g. Id.* at 227); Dr. Butalid (*see e.g. Id.* at 229), and Dr. Reagan (*see e.g. Id*. at 505-508).

Plaintiff's contentions are purely speculative. Plaintiff assumes there were vacancies in provider positions at Centralia between 2022 and 2025, but offers no evidence to show this (Doc. 73-3, p. 10), does not know the hours providers were supposed to work at Centralia (*Id.* at 9); does not know how many hours providers work in a given year and doesn't know whether Dr. Myers or other providers were meeting those hours (*Id.* at 10); and does not know why there were alleged vacancies at Centralia (*Id.*).

Plaintiff contends that there were no full-time doctors at Centralia for the first month of his incarceration (Doc. 73-3, p. 30; Doc. 89, pp. 7-8). In Plaintiff's response brief, he offers evidence of timecards of Centralia providers to show these providers were not working full time from February 10, 2022 to March 1, 2022 (Doc. 89, pp. 36-92). While Plaintiff provides timecards of providers working at Centralia, it is not clear how many hours these providers were supposed to work, how many providers were supposed to be working at Centralia, or how these timecards in any way indicate understaffing. Plaintiff began to receive consistent treatment in March 2022. And there is simply not enough evidence to show that a delay, due to understaffing, from February 10, 2022 to March 23, 2022 constituted deliberate indifference, or that Jeffries knew about this window and recklessly failed to remedy it. Deliberate indifference requires subjective intent to disregard a known risk, and while Plaintiff provides timecards of Centralia providers, the timecards do not constitute evidence of Jeffrey's state of mind.

Moreover, Plaintiff does not show that purported understaffing during the first month of his stay at Centralia "caused some degree of harm." *Walker*, 940 F.3d at 964 ("In

cases such as this one—whether the plaintiff alleges the defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present verifying medical evidence that the delay, and not the underlying condition, caused some harm.") (citation omitted); *Williams v. Liefer*, 491 F3d 710, 715 (7th Cir. 2007) (requiring "verifying medical evidence" that the delay caused some degree of harm).[5]

iii. *Plaintiff's* Monell *Claim Against Wexford*

Finally, Plaintiff argues that Wexford can be held liable for understaffing of medical personnel at Centralia in violation of the Eighth Amendment (Doc. 10). The Court analyzes this claim as a *Monell* claim according to *Monell v. Department of Social Services*, 436 U.S. 658 (1911). The Seventh Circuit has held that, in order to be "[c]onsistent with the Supreme Court's guidance, we have repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 240 (7th Cir. 2021) (citing *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567-68 (7th Cir. 2021)); *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019).

To successfully claim *Monell* liability against Wexford based on Plaintiff's personal experience at Centralia is an uphill battle. Doing so "is necessarily more difficult for a plaintiff to demonstrate…because what is needed is evidence that there is a true

---

[5] Both Plaintiff and Defendant Jeffries discuss the emergency transfer of 170 inmates from Pontiac to Centralia on the night of February 9, 2022 (Doc. 70, pp. 7-8; Doc. 73-3, p. 31). However, the Court previously dismissed this claim in its threshold order (Doc. 10, p. 3-4). The Court therefore will not take up this issue here.

municipal policy [or custom] at issue, not a random event.'" *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (internal quotations and citations omitted). Plaintiff offers no evidence of a customary practice at Centralia of Wexford understaffing medical personnel, let alone evidence to the degree required by a *Monell* claim. Indeed, much of the same reasoning as to why Plaintiff's claim against Director Jeffries fails regarding staffing issues applies here as well and is fatal to Plaintiff's *Monell* claim. *See supra* pp. 16-17. As a result, Wexford is entitled to summary judgment.

## CONCLUSION

Defendants Percy Myers, Rob Jeffreys, and Wexford Health Sources, Inc.'s motions for summary judgment (Docs. 69, 72) are **GRANTED.** Plaintiff's claims are **DISMISSED with prejudice** and judgment will be entered in Defendants' favor. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 30, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**